George Riley MALLARD, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–16141.

Court of Criminal Appeals of Oklahoma.

Oct. 6, 1971.

Rehearing Denied Dec. 10, 1971.

Andrew T. Dalton, Jr., Public Defender, for plaintiff in error.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

George Riley Mallard, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Tulsa County for the offense of Murder; his punishment was fixed at death, and from said judgment and sentence, a timely appeal has been perfected to this Court.

Briefly stated, the evidence at the trial adduced that on January 13, 1970, one Nathan Wright was shot to death at his apartment in Tulsa. The first three witnesses, Mr. and Mrs. Gaines, and Georgia Myles, testified that they were residents of the apartment house wherein the events occurred on the evening in question. They testified that they heard voices, scuffling, and shots coming from Nathan Wright's room. They retreated to their rooms after hearing the shots.

Henry Johnson, the owner of the apartment house, testified that he was checking the property on the evening in question. He had a conversation with J. B. Myles about a difficulty in the apartment house. He heard two shots and proceeded to Wright's room. He discovered Wright lying on the floor, and he then called the police. There did not appear to have been a struggle in the room. Wright was described as "a feeble old man that he took in and allowed him to collect the rents and do janitorial work at the apartment house."

Dwight Roland testified that he lived down the hall from Wright. He heard noises which aroused the other tenants. He went to Wright's room and heard Wright call for somebody to come and help him.

He heard someone attempting to open the door of Wright's apartment. He hid behind a dresser a short distance from the door, and he observed a person, whom he identified as the defendant, come out of Wright's room with what appeared to be a gun in his hand. The defendant said to keep on the floor, and he ran toward his room. He heard someone run down the hall, and after coming back out of his room, he observed Wright lying on the floor of his apartment.

The State was allowed to use the Preliminary Hearing Transcript of the testimony of John Myles after the trial court conducted an Evidentiary Hearing and ascertained that the State had been diligent in attempting to locate him. Myles testified that he lived in the apartment house with his wife, Georgia. He was awakened by voices, and he heard Wright pleading for help. He also heard two shots. He left to call the police and returned to the room with Mr. Johnson. He admitted three prior felony convictions.

The court conducted an additional Evidentiary Hearing to determine the marital status of Shirley Jean Anderson and the defendant. She testified at the hearing that she had been living with the defendant for some time, and although they had not been married at a ceremony, that she considered herself married to the defendant. She testified that she was married to one Anderson in 1964, and had not obtained a divorce, and that she kept dates with men for money. The court, thereupon, ruled that the defendant and Shirley Jean Anderson were not man and wife, and allowed her to testify.

She testified that she lived with the defendant at the Brown Apartments. She went home on January 12th, at approximately 10:00 p. m. The defendant came to the apartment at about 2:15 in the morning, and he left shortly thereafter, stating that he would be back if he didn't get caught. He returned at approximately 3:45 a. m.; his shirt was bloody, and he had a pistol in the top of his pants. He had a smile on his face, and said that he had killed a man down the street at an apartment. She packed their things and they left in a car, accompanied by Robert Marshal. The defendant wanted to take Roseanne Mason, who was at the apartment house. There was a large number of police cars around the apartment house. They drove to a filling station, and were shortly thereafter arrested by the police. She admitted being convicted of Prostitution.

Officer Cochran testified that he investigated the shooting at approximately 3:30 a. m., and preserved the scene.

Officer Goodenough testified that he took pictures of the scene and found two cartridge cases, and thereafter observed a Colt automatic sticking from beneath the passenger side of a 1963 Oldsmobile, parked near the apartment house. He took the gun from the car.

Officer Harrison testified that he obtained two bullets from the pathologist. Officer Lewallen testified that he forwarded the physical evidence to the Federal Bureau of Investigation. George Berley, a special agent of the Federal Bureau of Investigation, testified that he examined the physical evidence and that, in his opinion, the bullet and cartridge cases were fired from the pistol which was introduced into evidence.

Officer Vause testified that he interviewed persons present at the apartment house and relayed a possible description to the dispatcher, which was broadcast to all police units. He shortly thereafter went to another location and observed an Oldsmobile stopped by another officer. The defendant was sitting in the driver's seat, and the car contained a white female, and another Negro male. He observed a pistol laying on the floorboard on the passenger's side in the back seat.

Officer Chisum testified that he heard a description of a possible suspect in a homicide investigation and a description of a car in which a gun was being passed around at

a service station, on his radio. He was in the immediate vicinity and observed the car coming down the street. He followed the car for a period, and the car stopped. The defendant got out of the car and was placed under arrest. He observed two individuals in the car, a Negro male by the name of Marshal, and a white female by the name of Anderson. He further observed a gun laying on the floorboard in the back seat of the car.

Officer Jones testified that he made an investigation at the apartment house and made certain sketches and diagrams.

Nathan Blackman testified that he was a pawnbroker. He identified the pistol in evidence as the weapon that he had previously sold to Nathan Wright.

Dr. Lowbeer, a pathologist, testified that he performed an autopsy on the body of Nathan Wright, and that in his opinion, the cause of death was a bullet wound. He removed the bullet from the body and turned it over to Officer Harrison. He testified that from the entrance wound and the path of travel of the bullet, it would be compatible that the victim was either on his knees, or on the floor, and that the person firing the bullet was above the victim.

The defendant did not testify, nor was any evidence presented in his behalf.

The defendant cites five propositions, which are as follows:

"(1) Whether the courtroom identification of the defendant was independent of an illegal pre-trial lineup;

(2) Whether the courtroom identification of the defendant was purged of any primary taint of possible misidentification based upon two photographs of the defendant viewed by a witness before the lineup;

(3) Whether the trial court properly excused certain prospective jurors for cause who could not assess the death penalty in this case;

(4) Whether the gun found in the back of the automobile the defendant was driving could be seized and introduced into evidence without a search warrant; and

(5) Whether the penalty imposed upon the defendant is excessive."

 The first two propositions are based on the premise that the in-court identification was tainted, in that the witness was shown two pictures of the defendant prior to the lineup, and that he was subjected to a lineup without counsel. The court conducted an Evidentiary Hearing to suppress the in-court identification prior to trial. After hearing the evidence and examining a picture of the lineup, the court ruled that the identification was not tainted by the showing of pictures or by the lineup. We do not condone the practice of showing a witness a picture of a single suspect, or conducting a lineup without counsel; however, in the instant case we are of the opinion that the trial court did not err in considering the totality of the circumstances in ruling that the in-court identification was not tainted. We strongly urge that in future situations that the guidelines set forth by this Court in Thompson v. State, Okl.Cr., 438 P.2d 287, be strictly followed.

Because of the ultimate conclusion in this case, we do not deem it necessary to discuss the third proposition concerning the exclusion of jurors in this opinion.

 We further find the fourth proposition, wherein the defendant contends that the search was illegal, to be without merit. We are of the opinion that Officer Chisum had reasonable cause to arrest the defendant. In State v. Chronister, Okl.Cr., 353 P.2d 493, we stated in the second paragraph of the Syllabus:

"The use of the term 'probable cause' or 'reasonable cause' itself imports that there may not be absolute, irrefutable cause. If the facts are such that a reasonably prudent man would have believed

accused guilty, and would have acted upon that belief, a police officer is justified in making an arrest without warrant, although subsequent events prove that no offense had been committed, or if committed, that accused had no connection with it, where the statute authorizes arrest without warrant when the officer has reasonable grounds for believing that the person arrested had committed a felony, although not in his presence."

In the instant case, the arresting officer had information that a homicide had been committed. He heard two radio broadcasts within a short period of time concerning a description of the suspect, and a description and the direction of a car in which three persons were passing around a gun near the homicide scene. We are of the opinion that applying the rule enunciated in *Chronister*, supra, that the arrest was lawful, and that the search of the vehicle which was incident to the arrest, likewise was lawful. We further observe that the testimony revealed that the gun was laying in plain sight. We have repeatedly held that observing items in plain view is not a search. Cheatham and Sheffield v. State, Okl.Cr., 483 P.2d 1172.

█ The final proposition contends that the death sentence is excessive. The defendant cites a number of cases wherein this Court has modified the death penalty to life imprisonment because of errors committed in the trial court and in the furtherance of justice. After extensively reviewing the entire record and comparing the punishment imposed in similar cases, taking into consideration the questionable extrajudicial identification of the accused, we are of the opinion that justice would best be served by modifying the judgment and sentence from death to life imprisonment, and as so modified, the judgment and sentence is Affirmed.

Modified and affirmed.

BRETT and NIX, JJ., concur.